UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| L.A., a minor child, by her parent, next friend, and legal guardian, Rai Eury; and JANE DOE; all plaintiffs on their own behalf and on behalf of a class of those similarly situated, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No: 1:25-cv-596-MPB-TAB |
| MIKE BRAUN, in his official capacity as Governor of the State of Indiana; LARRY K. ERVIN, in his official capacity as State Registrar & Division Director of Vital Records of the Indiana Department of Health, | ) ) ) ) ) ) | |
| Defendants. | ) | |

**Amended Class Action Complaint for Declaratory and Injunctive Relief**

1.     L.A. is a 15-year-old transgender girl who realized when she was a very young child that, despite a birth-assigned sex of male, she identifies as female. Jane Doe is an adult whose birth-assigned sex was also male, but who has also long recognized that she is female. In recognition of the fact that L.A. is a transgender girl and Ms. Doe is a transgender woman, Indiana state trial courts have issued orders that the gender markers on their birth certificates should be changed to female. Although the orders were presented to local health departments so that that the Indiana State Board of Health could change the gender markers on their birth certificates to female, no changes have been

made to the birth certificates. This is because of Executive Order 25-36, issued by defendant Braun on March 4, 2025, which announces that it is the policy of Indiana to recognize that the sex of a person is fixed at birth and that "[m]odern gender ideology is internally inconsistent, diminishes sex and gender as identifiable categories, yet nevertheless maintains that it is possible for a person to be born in the wrong sexed body." Consequently, the Executive Order prohibits state agencies from "maintain[ing] any statements, policies, regulations, forms, communications or other messages that promote or otherwise inculcate modern gender ideology." As a result, defendant Ervin, the Indiana State Registrar, is refusing to process gender marker changes for persons whose gender does not match their sex as defined by Governor Braun and the Executive Order, even if a state court has ordered the change.

2.      The Executive Order is disconnected from the reality that transgender persons and other gender-diverse persons exist in Indiana. The reality that gender identity may differ from the sex assigned at birth is a matter of science and medicine and also is recognized by courts, including the United States Supreme Court.

3.      While the Governor is free to have his opinions about transgender and gender-diverse persons, the Executive Order and its implementation is a targeted attempt to impose hardships on a disfavored group and represents discrimination on the grounds of both sex and transgender status. This violates equal protection no matter what level of scrutiny is applied. The Executive Order and its implementation also violates the

constitutional right of privacy enjoyed by plaintiffs and the putative class that is protected by due process.

4.    Accordingly, L.A., Ms. Doe, and the putative class are entitled to appropriate declaratory and injunctive relief.

**Jurisdiction, venue, and cause of action**

5.    This Court has jurisdiction of this case pursuant to 28 U.S.C. § 1331.

6.    Venue is proper in this district pursuant to 28 U.S.C. § 1391.

7.    Declaratory relief is authorized pursuant to Rule 57 of the Federal Rules of Civil Procedure and 28 U.S.C. §§ 2201, 2202.

8.    This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation, under color of state law, of rights secured by the Constitution of the United States.

**Parties**

9.    L.A. is a 15-year old girl who was born in Indiana, although she now resides in Ohio, with her parent, legal guardian, and next friend, Rai Eury.

10.    Jane Doe is the pseudonym of an adult resident of Indiana.

11.    Mike Braun is the duly elected Governor of the State of Indiana. He is sued in his official capacity.

12.    Larry K. Ervin is the duly appointed State Registrar and Division Director of Vital Records at the Indiana Department of Health. He is sued in his official capacity.

**Class action allegations**

13.     Plaintiffs bring this action on their own behalf and on behalf of a class of persons

similarly situated pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure.

14.     The class is defined as:

> all present and future persons who are unable to obtain a change in the
> gender marker on their Indiana birth certificate because of Executive Order
> 25-36 and/or any subsequent similar Executive Orders.

15.     As defined, the class meets all the requirements of Rule 23(a) of the Federal Rules

of Civil Procedure in that:

a.     The class is so numerous that joinder of all members is impracticable.

b.     There are questions of law or fact common to the class.

c.     The claims of the representative parties are typical of those of the class.

d.      The representative parties will fairly and adequately protect the interests
of  the class.

16.     The further requirements of Rule 23(b)(2) of the Federal Rules of Civil Procedure

are met here in that at all times defendants have acted and have failed to act on grounds

generally applicable to the class.

17.     Undersigned counsel are appropriate attorneys to be appointed to represent the

class pursuant to Rule 23(g) of the Federal Rules of Civil Procedure.

**Factual allegations**

*Background as to transgender persons, gender dysphoria, and the treatment of gender dysphoria*

18.     Gender identity refers to a person's core sense of belonging to a particular gender.

[4]

19.    Although the precise origin of gender identity is unknown, a person's gender identity is a fundamental aspect of human development. There is a general medical consensus that gender identity has a significant biological component.

20.    Every person has a gender identity; it is not a personal decision, preference, or belief. A person's gender identity cannot be altered through medical intervention.

21.    A person's gender identity usually matches, or is congruent with, the sex they were designated at birth based on their external genitalia.

22.    Most people who identify as boys or men are designated male at birth based on their external genital anatomy, and most people who identify as girls or women are designated female at birth based on their external genital anatomy. Persons whose gender identities are congruent with the sex they were assigned at birth are referred to as "cisgender."

23.    Transgender people have gender identities that are not congruent with their sex as assigned at birth. For example, a transgender boy is someone who was assigned a female sex at birth but persistently, consistently, and insistently identifies as male. A transgender girl is someone who was assigned a male sex at birth but persistently, consistently, and insistently identifies as female.

24.    Studies indicate that up to 0.6% of adolescent and adult persons in the United States are transgender. UCLA School of Law-Williams Institute, *How Many Adults and Youth Identify as Transgender in the United States*, https://williamsinstitute.law.ucla.edu

[5]

/publications/trans-adults-united-states/#:~:text=Over%201.6%20million%20adults%20 (ages,compared%20to%20the%20U.S.%20population (last visited Mar. 19, 2025).

25.    Persons other than transgender persons may have gender identities that differ from their birth-assigned sex.

26.    Nonbinary people have a gender identity that is neither exclusively male nor female. One survey notes that there are more than 1.2 million nonbinary adults in the United States. Wilson and Meyer, UCLA SCHOOL OF LAW – WILLIAMS INSTITUTE, *Nonbinary LGBQ Adults in the United States* at 2, https://williamsinstitute.law.ucla.edu/wp-content/uploads/Nonbinary-LGBTQ-Adults-Jun-2021.pdf (last visited Mar. 19, 2025).

27.    A nonbinary person may have a gender identity different than the sex they were assigned at birth.

28.    Intersex persons are born with sex characteristics that do not fit the binary notion of "male" and "female." This may result in an individual being born with both "male" and "female" genitalia and may involve chromosomal patterns that do not fit typical notions of binary male or female characteristics. They may not produce either, or may produce both, the "large reproductive cell" (the ovum) or the "small reproductive cell" (sperm), that are at the core of the Executive Order. A fact sheet issued by the United Nations for LGBT Equality reports that "[a]ccording to experts, between 0.05% and 1.7% of the population is born with intersex traits—the upper estimate is similar to the number red haired people." United Nations, FREE & EQUAL-UNITED NATIONS FOR LGBT EQUALITY

[6]

at    1,    https://web.archive.org/web/20160304071043/https://unfe.org/system/unfe-65-Intersex_Factsheet_ENGLISH.pdf (last visited Mar, 19, 2025).

29.    Some intersex people are transgender because their gender identity differs from their birth-assigned sex.

30.    For people whose gender identity differs from their sex assigned at birth, the incongruence between their gender identity and sex assigned at birth can cause clinically significant distress and discomfort.

31.    "Gender dysphoria," codified in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, 5th edition, Text Revision (DSM-V-TR) at 302.6 (for children) and 302.85 (for post-pubertal adolescents and adults), is the diagnostic term for this clinically significant distress resulting from the lack of congruence between a person's gender identity and the sex assigned to them at birth.

32.    To be diagnosed with gender dysphoria, the incongruence must have persisted for at least six months and be accompanied by clinically significant distress or impairment in social, occupational, or other important areas of functioning.

33.    Untreated, gender dysphoria results in significant lifelong distress, clinically significant anxiety and depression, self-harming behaviors, substance misuse, and suicidality.

34.    This extremely debilitating and dangerous distress may be alleviated by helping the person suffering from gender dysphoria to live in alignment with their gender

identity. This treatment is sometimes referred to as "gender transition," "transition-related care," or "gender-affirming care."

35.    One form of this care is for the person to express themselves in a way that aligns with their gender identity. This can involve the person changing their name, pronouns, and how they physically present themselves with wardrobe and hairstyle, among other things. This is known as social transitioning.

36.    Another form of gender-affirming care is the provision of puberty-delaying medical treatment through medications, generically known as puberty blockers, which are prescribed at the earliest sign of puberty. A puberty blocker interrupts the sequence of hormonal signals of the pituitary gland that control puberty. This means that the testicles or ovaries remain at a prepubertal stage that are incapable of production of testosterone (for a child born with testicles) or estradiol (for a child born with ovaries) that control the many bodily changes associated with puberty. Puberty will resume when puberty blockers are stopped.

37.    For many youths whose gender identity is different from their birth-assigned sex, puberty blockers are a medical necessity as they mitigate the significant anxiety and extreme distress experienced by adolescents as the physical changes of endogenous puberty begin and they start experiencing potentially permanent physical changes in their bodies that are incongruent with their gender identity. Puberty-delaying medication allows transgender adolescents to avoid this, therefore minimizing and potentially

preventing the heightened gender dysphoria and these permanent physical changes that endogenous puberty would cause.

38.    For people whose gender identities differ from their birth-assigned sex, it may be medically necessary and appropriate to initiate hormonal therapy to align their physical characteristics with their gender identity. This may involve the provision of testosterone for those whose sex assigned at birth was female and estrogen and testosterone suppression for those whose sex assigned at birth was male.

39.    Administration of these hormones will allow the person to develop the secondary-sex characteristics typical of their gender identity. For example, transgender male youth and men treated with gender-affirming hormones will receive testosterone that cisgender males generate through their gonads They will develop the phenotypic features of non-cisgender males such as muscle mass, fat distribution, facial and body hair, and lower vocal pitch. Likewise, transgender female youth and women who receive gender-affirming hormones will receive the estrogen that non-transgender female youth and women generate endogenously. They will develop the same muscle mass, fat distribution, skin and female hair patterns, and breasts typically associated with cisgender females.

40.    In adulthood, a person whose gender identity differs from their birth-assigned sex may choose to obtain gender-affirming surgery. There are various forms of surgery that are designed to align a person's physical appearance with their gender identity and may

involve such things as "bottom surgery"—reconstruction of the genitals through vaginoplasty or phalloplasty, and "top surgery"—mastectomy or breast augmentation.

41.    The surgery is designed to address the person's gender dysphoria by allowing their body to conform to their gender identity.

42.    Persons whose gender identity differs from their birth-assigned sex have historically been subject to discrimination, violence, and harassment. One report notes that "[t]ransgender people are over four times more likely than cisgender people to experience violent victimization, including rape, sexual assault, and aggravated or simple assault." UCLA School of Law- Williams Institute, *Transgender people over four times more likely than cisgender people to be victims of violent crime*, Mar. 23, 2021, https://williamsinstitute.law.ucla.edu/press/ncvs-trans-press-release/ (last visited Mar. 20, 2025). "[T]he American Medical Association has even referred to violence against transgender people as an 'epidemic.'" Lantz, Faulkner, Mills, J. INTERPER VIOLENCE, *A Descriptive Account of the Nature and Extent of Transgender Homicide in America, 2010 to 2021*, Jan. 2024 at 341-368, Abstract. As the Seventh Circuit has noted, "[t]here is no denying that transgender individuals face discrimination, harassment, and violence because of their gender identity." *Whitaker by Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Ed.*, 858 F.3d 1034, 1051 (7th Cir. 2017), *abrogated in non-relevant part by Illinois Republican Party v. Pritzker*, 973 F.3d 760, 762 (7th Cir. 2020).

*Indiana law concerning the changing of gender markers*

43.     Indiana Code § 16-37-2-10(b) allows the State Department of Health to "make additions to or corrections in a certificate of birth on receipt of adequate documentary evidence."

44.     Defendant Ervin, as the State Registrar and a Division Director of Vital Records at the Indiana Department of Health, heads the office that is in charge of vital statistics, including birth records, and is responsible for making changes to those records.

45.     Court orders changing birth certificates are common, for instance, when the paternity of a child has been judicially established or when adoptions occur.

46.     Traditionally, the Department of Health "defers to the courts by requiring a court order to establish adequate documentary evidence for an amendment of gender on a birth certificate." *In re Petition for Change of Birth Certificate*, 22 N.E.3d 707, 709 (Ind. Ct. App. 2014).

47.     In the past, once such an order was presented, the Department of Health has changed the gender marker and has issued a new birth certificate with the gender marker corrected.

*The Executive Order*

48.     However, Executive Order 25-36 has altered the practice of the Department of Health of changing gender markers on birth certificates following court orders granting that change.

49.     The Executive Order, which is attached as Exhibit 1, was issued on March 4, 2025, and is entitled "Respecting the Biological Dichotomy Between Men and Women as a Fundamental & Deeply Rooted Legal Principle Embedded in Indiana."

50.     Using identical language to President Trump's January 20, 2025 Executive Order, "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government," Executive Order 25-36:

- declares "sex" to be an individual's "immutable biological classification as either male or female;"

- defines "female" as "a person belonging, at conception, to the sex that produces the large reproductive cell;" and "male" as "a person belonging, at conception, to the sex that produces the small reproductive cell;"

- defines "women" and "girls" as "adult and juvenile human females" and defines "men" and "boys" as "adult and juvenile human males."

51.     Similar to President Trump's Executive Order, Executive Order 25-36 declares that:

It is the official position of Indiana's Executive Branch that modern gender ideology is inconsistent with this fundamental and deeply rooted legal distinction between men and women. Modern gender ideology attempts to replace the biological category of sex with an ever-shifting concept of self-assessed gender identity. . . . . Modern gender ideology asserts the false claim that men can identify as and thus become women and vice versa, and it would require all institutions of society to regard this false claim as true. . . . Modern gender ideology is internally inconsistent, diminishes sex and gender as identifiable categories, yet nevertheless maintains that it is possible for a person to be born in the wrong sexed body.

52.     Having made this pronouncement, the Executive Order states that:

State funds shall not be used to promote gender ideology. Each agency shall

[12]

assess grant conditions and grantee preference and ensure grant funds do not promote gender ideology. Indiana's Executive Branch agencies shall not:

- Promote or otherwise inculcate modern gender ideology; or

- Issue or maintain any statements, policies, regulations, forms, communications or other messages that promote or otherwise inculcate modern gender ideology.

53.    On March 14, 2025, defendant Ervin issued a notice to all local health departments and their administrators in Indiana that specified:

As of March 4, 2025, per Executive Order 25-36 issued by Indiana Governor Mike Braun, the Indiana Department of Health Division Vital Records will not process gender change request for Indiana birth records.

(Exhibit 2).

*Plaintiff L.A.*

54.    L.A. is a 15-year old transgender girl who lives in Ohio, although she was born in Indiana.

55.    L.A. has identified as a girl since she was 3 years old and her parent has treated her as a girl since that time.

56.    When she was 3 or 4, L.A. chose to wear dresses and chose to be addressed by a feminine name.

57.    When she was 4 or 5 years old, she began to see a therapist and shortly thereafter she was diagnosed with gender dysphoria.

58.    Being able to dress as a girl and use a feminine name served to lessen, but certainly

not eliminate, the anxiety, depression, and general dysphoria with which she suffered because of the disconnect between her birth-assigned sex and her gender identity.

59.    When she was 8 years old she was granted a change of name by a court in Ohio so that her first name was legally changed to a name commonly associated with girls.

60.    The decision to obtain a name change was entirely L.A.'s as she was adamant about wanting and needing the name change as she is a girl.

61.    L.A. had a great deal of stress, anxiety, and depression about the prospect of going through male puberty.

62.    Therefore, in consultation with her treating medical and mental health professionals, she began to receive a puberty blocker in 2021 that prevented her body from entering male puberty with its attendant physical changes.

63.    In December of 2023, again in consultation with her treating professionals, in order to begin puberty in line with her cisgender peers, she began to receive estradiol (estrogen) as part of her gender-affirming care.

64.    She continues to receive the hormone replacement therapy and it has caused her body to develop typically feminine features including breasts, the softening of her skin, and redistribution of fat consistent with that of an adolescent female.

65.    Becoming more feminine in appearance, while not ending the anxiety and depression that characterizes L.A.'s gender dysphoria, has greatly reduced it.

66.    L.A. is known by all, her friends, family, acquaintances, and the world at large, as

an adolescent girl.

67.    Many persons do not know that she is a transgender girl.

68.    Although L.A. received a formal name change from an Ohio court, since she was born in Indiana she could only receive a gender marker change to her birth certificate in an Indiana judicial proceeding.

69.    Obtaining a gender marker change so that her birth certificate matches her gender identity is extremely important for L.A. as it reaffirms her identity as a young woman.

70.    On March 14, 2025, an Indiana trial court granted L.A. a gender marker change on her birth certificate from male to female. The order also recognizes that her current legal name is L.A., not the typically male name that she was given at birth.

71.    However, due to defendant Braun's Executive Order and defendant Ervin's implementation of it, the gender marker on her birth certificate will not be changed and will continue to label her as male.

72.    This is extremely problematic for numerous reasons.

73.    A birth certificate is a fundamentally important identification document that a person uses to establish their identity throughout their lifetime and is used for a wide variety of purposes, including proof of citizenship and age; obtaining a driver's license; joining the military; opening bank accounts; enrolling in school; replacing a social security card; applying for government benefits; and, depending on the state, obtaining a marriage license.

74.    L.A. is female in appearance and will become more so as she continues with her hormone replacement therapy and matures into a post-pubertal woman.

75.    Having to present a birth certificate that identifies L.A. as "male" will immediately create a risk of "outing" her as transgender to all who view the birth certificate, or may result in others questioning whether her birth certificate is authentic or genuine as she has a female name and appears in all respects to be a girl and will only appear more feminine in the future.

76.    Each of these eventualities is extremely disturbing to L.A. as both will require her to divulge her transgender status to perfect strangers at the license branch, for instance, or in other circumstances where she will have to present her birth certificate.

77.    The fact that her gender marker is not changed on the birth certificate will lead to predictable difficulties in obtaining a driver's license or other benefits and services for which presentation of a birth certificate is a prerequisite.

78.    The prospect of strangers learning this intimate information is extremely disturbing to L.A.

79.    Although L.A. has begun to advocate around transgender issues and has, at times, identified herself as transgender, she certainly does not make this disclosure to strangers in the normal course of her life and wants to be able to control to whom she discloses her transgender status. She does not want to be forced to disclose this in situations where she is put at risk of harm, which is certainly possible in those situations where she will be

[16]

required to present a birth certificate that does not match her gender identity and appearance.

80.    Her gender dysphoria, which she still suffers from, has been ameliorated as she has been able to identify and appear as the girl that she is.

81.    Being saddled with a primary identification document—the birth certificate—that fails to match her gender identity will cause her serious emotional and mental harm.

82.    Even if others do not know that her gender marker on her birth certificate is male, she will know, and this knowledge and the knowledge that no matter what she does she will not be recognized as female, will be a continuing source of serious harm and distress to her.

83.    However, when persons do learn that she was not born a female, as persons inevitably will, she will be exposed to the discrimination and the elevated risk of harm and violence that all transgender persons face.

*Plaintiff Jane Doe*

84.    Jane Doe is an adult resident of Indiana.

85.    Although her birth-assigned sex was male, she has long recognized that she is a female born into the wrong body.

86.    She knows herself as a woman and has lived as a woman since at least 2020.

87.    She has been diagnosed with gender dysphoria.

88.    For more than four years she has been prescribed and has taken estrogen.

89.     She was also prescribed a testosterone suppressor that she took in addition to the estrogen.

90.     However, she now has so little testosterone in her body that she no longer needs to take the testosterone suppressor.

91.     Administration of the hormones has resulted in the feminization of her body.

92.     Additionally, she has received feminizing mammoplasty, or "top surgery," that has augmented her breast tissue to create feminine breasts.

93.     She is female in appearance.

94.     As a result, many persons do not know that she is transgender.

95.     She has received a legal name change so that her legal first name is the feminine first name that she has used for years.

96.     She was born in Indiana and her birth certificate states that her sex is "male."

97.     On March 28, 2025, following a hearing, an Indiana trial court ordered that the gender marker on her birth certificate be changed to "female."

98.     On April 11, 2025, she submitted the order to the county health department in the Indiana county of her birth so that the gender marker on her birth certificate could be changed.

99.     She was told that the order would be submitted to the Indiana State Department of Health.

100.   On May 2, 2025, when the local health department had not received a response regarding the gender marker change, Ms. Doe called Vital Records Customer Service at the Indiana State Department of Health to inquire as to the status of the gender marker change.

101.   However, the Department of Health employee with whom she spoke was not able to answer why the gender marker had not been changed on her birth certificate as ordered by the court.

102.   Instead, her call was transferred to defendant Ervin. However, her call went to voicemail.

103.   Although she left a message on Mr. Ervin's voicemail, she has never received a response.

104.   Now she understands that because of Executive Order 25-36, the gender marker on her birth certificate will not be changed to female.

105.   This injures her in a number of ways.

106.   She is covered by her spouse's health insurance. However, she is listed as "male" on the insurance.

107.   Her sex on her spouse's insurance cannot be changed unless and until her birth record is changed to show that she is female and she submits the amended birth certificate to the insurance company.

108.    When her prescriptions are filled, they are in her female name. But the insurance is for a person who is listed as "male," and this has resulted in her having to "out" herself to those at the pharmacy and to those who are within earshot as she has had to explain why the insurance lists her as male but she appears to be female and has a female name.

109.    Because of a declaration that her medical provider completed and that she submitted to the Bureau of Motor Vehicles long before the Governor's Executive Order, her driver's license currently notes her sex as "F." However, it is set to expire in 2027, and based on the Executive Order, her next license will be marked as "M."

110.    Moreover, given that the Bureau of Motor Vehicles has a record that she is a transgender person, she is unsure if, because of the Governor's Executive Order, her current license will soon be reissued with "M" as her gender.

111.    She is concerned that there are situations in the future where she will have to use her birth certificate as identification and given that the gender maker on her birth certificate does not match her gender identity she fears that this will cause difficulties and will require her to "out" herself as transgender.

112.    Ms. Doe has, at times, identified herself as transgender. However, she wants to control to whom she discloses her transgender status. And she does not want to be forced to disclose this information in situations where she might be at risk of harm, which is possible if she is forced to present a birth certificate that does not match her gender identity, or in other situations.

[20]

113.    She is aware that transgender persons are at risk of being discriminated against and being subjected to bullying, threats, and violence.

114.    It is extremely important to her that she be recognized as female in all aspects of her life as being able to be who she truly is helps mitigate the depression, anxiety, and other negative consequences of her gender dysphoria.

115.    Even if no one is aware of the fact that she is listed as male on her birth certificate, having this foundational identification document—her birth certificate—misgender her is a constant source of irritation and stress and causes her harm.

*Concluding allegations*

116.    There is no legitimate, let alone substantial, governmental interest that justifies the Executive Order and its effect of prohibiting defendant Ervin from changing gender-markers even when court ordered, especially inasmuch as such changes were allowed and occurred prior to March 4, 2025.

117.    L.A., Jane Doe, and the putative class are being caused irreparable harm for which there is no adequate remedy at law.

118.    At all times defendants have acted and have failed to act under color of state law.

**Legal claims**

119.    To the extent that the plaintiffs and the putative class are being denied the ability to have their gender markers changed as ordered by Indiana courts, the defendants are violating the Equal Protection Clause of the Fourteenth Amendment to the United States

Constitution.

120.    The failure of defendants to allow the gender marker to be changed on the birth certificates of the plaintiffs and the putative class necessarily exposes their transgender status to others in violation of the right of privacy in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

**Request for relief**

WHEREFORE, the plaintiffs request that this Court:

a.  accept jurisdiction of this case and set it for hearing at the earliest opportunity;

b.  certify this case as a class action pursuant to Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure;

c.  declare that defendants are violating the Constitution for the reasons noted above;

d.  enter a preliminary injunction, later to be made permanent, enjoining Executive Order 25-36 and defendants' reliance on it so that the plaintiffs and all putative class members may obtain birth certificates with the gender marker changed consistent with their gender identity and court orders;

e.  award the plaintiffs and the class their costs and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988;

f.  award all other proper relief.

Kenneth J. Falk
Gavin M. Rose
Stevie J. Pactor
ACLU of Indiana
1031 E. Washington St.
Indianapolis, IN 46202

317/635-4059
fax: 317/635-4105
kfalk@aclu-in.org
grose@aclu-in.org
spactor@aclu-in.org

Attorneys for the Plaintiffs and the
Putative Class