UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| L.A., *et al.* | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No: 1:25-cv-596-MPB-TAB |
| | ) | |
| MIKE BRAUN, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO MOTION TO EXCLUDE OPINIONS OF DR. JAMES D. FORTENBERRY, M.D., M.S.**

Pursuant to this Court's July 16, 2025 Order (Dkt. 76), Plaintiffs submit this response in opposition to Defendants' Motion to Exclude Opinions of [Dr.] Fortenberry. (Dkt. 72).

**INTRODUCTION**

Dr. James D. Fortenberry, M.D., M.S. devoted the entirety of his professional career—spanning more than four decades—to the diagnosis and treatment of people, particularly young people, with gender identity issues. In that career, Dr. Fortenberry treated more than 2,500 patients. But the State of Indiana ignores this experience and seeks to exclude Dr. Fortenberry's expert testimony

Dr. Fortenberry's testimony is not excludable, whether under Fed. R. Civ. P. 37 or under Fed. R. Evid. 702. Dr. Fortenberry's decades of experience with thousands of

1

patients experiencing gender dysphoria means this Court must admit his opinions on gender identity, social transition, and the effects of Executive Order 25-36. Given his clear expertise, defendants' arguments that Dr. Fortenberry's testimony should be excluded as unreliable miss the mark. In any event, when a case is tried to the bench rather than a jury, a district court may choose to simply admit all expert evidence and give it whatever weight to which it is entitled. *See, e.g.*, *SmithKline Beecham Corp. v. Apotex Corp.*, 247 F. Supp. 2d 1011, 1042 (N.D. Ill. 2003) (Posner, J., sitting by designation), *superseded on other grounds*, 403 F.3d 1331 (Fed. Cir. 2005). But Dr. Fortenberry should be fully credited, and this Court should deny Defendants' motion to exclude.

**ARGUMENT**

**I.     Dr. Fortenberry's Significant Clinical Experience Validates His Opinions**

The State disputes Dr. Fortenberry's opinions on sex and gender identity, social transition, and the harm caused by preventing transgender people from changing gender markers, taking issue with his sources as not "based on sufficient facts or data" or "reliable principles and methods." (Dkt. 73 at 6)[1] (citing Fed. R. Evid. 702). As explained in Section II, *infra*, Dr. Fortenberry's opinions are based on sufficient data and reliable principles and methods. But the State ignores Dr. Fortenberry's most important

---

[1]     The State filed its brief under seal, as it referenced portions of Dr. Fortenberry's deposition transcript, which at that time was provisionally designated as confidential under the parties' protective order. The plaintiffs have indicated that the do not believe the transcript should be designated as confidential and have indicated that they do not object to the brief and the transcript being unsealed. (Dkt. 97).

2

qualification allowing him to render his opinions—he has decades of experience and has treated between 2,500 to 3,000 patients with gender dysphoria issues. (Dkt. 96-5 at 27:10 – 28:6).[2] Accordingly, Dr. Fortenberry's testimony is reliable and not excludable under Rule 702.[3]

The decision to permit or exclude expert testimony is "committed to the discretion of the district judge." *Roback v. V.I.P. Transp. Inc.*, 90 F.3d 1207, 1215 (7th Cir. 1996). The Language of Rule 702 "makes no relevant distinction between 'scientific' knowledge and 'technical or 'other specialized' knowledge. It makes clear that any such knowledge might become the subject of expert testimony." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999). As the Seventh Circuit further clarified, "Rule 702 allows a witness to be 'qualified as an expert by knowledge, skill, experience, training, or education.'" *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010) (citing Fed. R. Evid. 702) (emphasis in original). Indeed, "[a]n expert's testimony is not unreliable simply because it is founded on his experience rather than on data." *Id.* An expert's testimony can be admissible "even in the absence of any empirical data" when the expert's opinions are

---

[2] "Gender dysphoria" used to be referred to as "gender identity disorder," *see, e.g.*, *Cano v. S.C. Dep't of Corr.*, No. 9:22-cv-4247-DCC-MHC, 2023 WL 6644277, *13 n.3 (D. S.C. May 31, 2023), hence his testimony about "the patients that I treated with gender dysphoria or gender identity prior to coming to Indiana" (Fortenberry Dep., Dkt. 96-5 at 28:13-15).

[3] The State also objects to a portion of Dr. Fortenberry's deposition regarding the intent behind EO 25-36 as undisclosed in his expert report. His view was elicited by Defendants' counsel and given over Plaintiffs' counsel's objection. (Fortenberry Dep., Dkt. 96-5 at 110:19-111:4). This court can interpret for itself the intent of EO 25-36.

based on "considerable personal experience." *United States v. Moshiri*, 858 F.3d 1077, 1084 (7th Cir. 2017).

Dr. Fortenberry received his medical degree in 1979 and served as a Professor of Pediatrics at the Indiana University School of Medicine and an Adjunct Professor of Epidemiology at the Fairbanks School of Public Health until July 2025. (Dkt. 28-1 at 3, ¶6; Fortenberry Dep. Dkt. 96-5 at 18:11). He worked with people with gender identity issues for his entire career, and in 2016 he helped to found the Gender Health Program at Riley Children's Health. (Dkt. 28-1 at 3, ¶ 9). This program—the only comprehensive gender health program in Indiana that serves patients under the age of 21—offers medical, psychological, and social services support to children, teens, and young adults who have been diagnosed with gender dysphoria. (*Id.* at 3-4, ¶ 9). These services include the diagnosis of gender dysphoria in children and adolescents, treatment of anxiety and depression, psychological counseling, family education and counseling, support for name and gender marker change, transition support at schools, referral for speech therapy, and referral for surgical consultation.[4] (*Id.* at 4, ¶ 10).

Each month, Dr. Fortenberry personally provided or supervised the medical care of forty or more children, adolescents, and young people with gender dysphoria. (*Id.* ¶ 11). In all, Dr. Fortenberry has treated from 2,500 to 3,000 patients. (Fortenberry Dep.,

---

[4] These services also included the provision of gender-affirming hormone therapy and puberty blockers until those treatments were made unlawful by Indiana statute. (Dkt. 28-1 at 4, ¶ 10; 15-16, ¶¶ 43-44).

4

Dkt. 96-5 at 28:5-6). As part of his clinical practice and experience, Dr. Fortenberry is familiar with the latest medical science and treatment of gender dysphoria and disorders of sexual development. (Dkt. 28-1 at 5, ¶ 14).

Dr. Fortenberry notes that the care for gender transition is an evidence-based process to reliably mitigate gender dysphoria. (*Id.* ¶ 12). It includes establishing a gender expression and identity congruent with the patient's own internal experienced gender and happens in phases, typically over several years. (*Id.*). In Dr. Fortenberry's experience, social transition "is a critically important part of treatment" of people with gender dysphoria. (Dkt. 28-1 at 17, ¶ 49). And gender marker change is important for most of his patients as part of this process and for their self-affirmation, social acceptance, and safety in public spaces. (*Id.* ¶ 13). Accordingly, Dr. Fortenberry routinely discussed with his patients plans for pursuing gender marker revision and frequently signed documents used in support of requests for gender marker revisions. (*Id.*). When Dr. Fortenberry's patients did revise their gender markers on identity documents, they exhibited "marked improvement in overall wellbeing associated with document revision as well as improved perceptions of safety." (*Id.* at 22, ¶ 59).

Given his extensive experience, this Court routinely relies on Dr. Fortenberry's opinions regarding the nature, diagnosis, and treatment of gender dysphoria, and the importance of social transitioning to gender diverse youth. *See A.M. ex rel. E.M. v. Indianapolis Pub. Schs.*, 617 F. Supp. 3d 950, 957 (S.D. Ind. 2022) (preliminary injunction

5

vacated after voluntary dismissal for mootness); *B.E. v. Vigo Cnty. Sch. Corp.*, 608 F. Supp. 3d 725, 727, 732-33 (S.D. Ind. 2022) *aff'd sub nom. A.C. by M.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760 (7th Cir. 2023); *A.C. ex rel. M.C. v. Metro. Sch. Dist. of Martinsville*, 601 F. Supp. 3d 345, 350 (S.D. Ind. 2022) *aff'd*, 75 F.4th 760 (7th Cir. 2023) *cert. denied* 144 S. Ct. 683 (2024); *J.A.W. v. Evansville-Vanderburgh Sch. Corp.*, 396 F. Supp. 3d 833, 837 n.3 (S.D. Ind. 2019).

Dr. Fortenberry's experience is in marked contrast to the doctors whose opinions the State has primarily relied upon. The State relies on the opinion of Dr. Quentin Van Meter, a pediatric endocrinologist who has seen only 14 transgender persons as patients since 1993 and has done no research or writing in the areas in which he claims expertise. (Van Meter Dep., Dkt. 96-1 at 23:21-24, 24:20 – 25:1, 41:2-6). They also rely on Dr. Stephen Levine, a psychiatrist whose practice focuses on a variety of issues, and where people with gender dysphoria make up only about 10 percent of his patient load. (Levine Dep., Dkt. 96-4 at 17:15-21, 21:6-11). Plaintiffs have not sought to exclude the opinion of Dr. Van Meter or Dr. Levine, but the contrast with Dr. Fortenberry's expertise is obvious and telling.

## II. Dr. Fortenberry's Testimony Regarding Social Transition, Identity Documents, and Definitions of Sex and Gender Identity Relied on Sufficient Data

Although Dr. Fortenberry has significant clinical experience, thus satisfying Fed. R. Evid. 702, Dr. Fortenberry also relied on additional reliable sources when forming his opinions. Those sources represent sufficient facts and data and were based on reliable

principles and methods. Indeed, the State's own experts do not dispute even the conclusions reached in many of the studies Dr. Fortenberry relied on. And even if they did, a disagreement among experts is an issue for this Court to weigh, not cause for exclusion under *Daubert*. *See Bos. Sci. Corp. v. Cook Med. LLC*, No. 1:17-cv-03448-JRS-MJD, 2023 WL 1476573, at *12 (S.D. Ind. Feb. 2, 2023) (disagreements with certain data points "go to the *weight* of the evidence," not the admissibility). Dr. Fortenberry's opinions on social transition, identity documents, and definitions of sex and gender identity must be admitted.

*Social Transition.* As noted above, Dr. Fortenberry has decades of experience treating patients with gender dysphoria who benefit from social transition, the process whereby a transgender person lives in accordance with their gender identity (Dkt. 28-1 at 17, ¶ 49), and that experience is sufficient to admit his testimony. *Moshiri*, 858 F.3d at 1084. But the State believes Dr. Fortenberry's testimony on social transition should be excluded because of his reliance on the World Professional Association for Transgender Health's (WPATH) standards of care. They contend an "increasing consensus" rejects WPATH's recommendations. (Dkt. 73 at 15). However, that "consensus," as the State itself indicates, consists of primarily of political—not medical—entities. (*Id.*) (naming the U.S. Department of Health and Human Services and 27 state legislatures, including Indiana, as part of their "consensus").

At any rate, the State's issues with WPATH are beside the point. Dr. Fortenberry relied on both his considerable clinical experience treating people with gender dysphoria and other studies to reach the opinion that there are improved mental health outcomes associated with social transition. (Dkt. 28-1 at 17-18, ¶ 50). The studies Dr. Fortenberry relied on, such as the Olson 2016 or Durwood 2024 studies, are valid and useful for forming an opinion even if limited by the available sample size. (Dkt. 28-1 at 11 n.9, 18 n.19). The Olson 2016 study found transgender children who had socially transitioned and were supported in that transition had developmentally normative levels of depression, whereas those with gender dysphoria who had not socially transitioned had higher rates of psychopathology. (Dkt. 72-1 at 508). Likewise, the Durwood 2024 study found possible mental health benefits of social transitioning. (Dkt. 72-1 at 517). The best the State could muster to refute these findings was a review study finding only "limited, low quality evidence on the impact of social transition." (Dkt. 73 at 17). However, as the State's expert Dr. Levine conceded, "low quality" is a term of art in research, and not only do higher quality studies often implicate ethical concerns (for they would require intentionally depriving a patient of a therapy thought to be beneficial), but very few healthcare interventions are actually supported by "high quality" evidence. (Levine Dep., Dkt. 96-4 at 73:19 – 80:9).[5] In any event, what the State complains of represents a

---

[5] According to the Cochrane Database of Systematic Reviews, which identifies and appraises all evidence to answer specific research questions in healthcare (Levine Dep., Dkt. 96-4

8

dispute between experts for this court to weigh. *See Bos. Sci. Corp.* 2023 WL 1476573, at *12. Dr. Fortenberry's opinion on social transition must be admitted.

*Impact of Identity Documents*. The State challenges as unsupported Dr. Fortenberry's opinion that preventing transgender people from changing the gender markers on their identity documents presents a severe risk of harm. They take great pains, going study-by-study, to argue how the sources Dr. Fortenberry used do not sufficiently support his opinion. (Dkt. 73 at 20-24). However, they do not contend that Dr. Fortenberry erred in his description of the studies, and he did not. The objections are all focused on depreciating the significance of the studies because they fail to prove causation or, in the State's view, fail to account for confounding variables. (*Id.* at 19-20).

But "the fact that a study is associational—rather than . . . intended to show causation—does not bar it from being used to inform an expert's opinion." *United States v. W.R. Grace*, 504 F.3d 745, 765 (9th Cir. 2007). The association that does exist between identity documents and certain health outcomes mirrors Dr. Fortenberry's clinical experience, in which his patients showed a clear improvement in health outcomes when they changed the gender markers on their identity documents. (Dkt. 28-1 at 5, ¶ 13). Further, while the link to any health benefit from allowing changes in identity documents might be associational rather than causational, Dr. Fortenberry made clear that in all his

---

at 78:11-12), only 5.6% of healthcare interventions are supported by "high quality" evidence which is "consistent with [Dr. Levine's] impression." (*Id.* at 80:3-9).

9

experience and review of the literature, he has found only research showing benefits of changing gender markers, and no studies showing that allowing changes to identity documents causes harm. (*Id.* at 22, ¶ 59). The State does not argue to the contrary. Accordingly, Dr. Fortenberry's opinions regarding the impact of identity documents must be admitted.

*Sex and Gender Identity.* The State challenges as unsupported Dr. Fortenberry's opinions on the medical definitions of sex and gender identity. Again, these are issues of weight and not admissibility. Dr. Fortenberry's opinions are supported, both by his "considerable personal experience" and by citations to medical literature.

In particular, the State takes issue with the source Dr. Fortenberry relies upon to estimate the incidence of disorders of sexual development (DSDs) and argues its expert's sources put the prevalence of DSDs is around .022% of births, not the .05% to 1.7% Dr. Fortenberry's source document from the United Nations' "Free & Equal" campaign identified. (Dkt. 28-1 at 9, ¶ 21). But as Dr. Van Meter pointed out, this difference is likely due to differences in the definition of DSDs, with Dr. Fortenberry's figure using a broader definition. (Dkt. 67 at 8-9, ¶ 28). The point Dr. Fortenberry's report communicated was not that DSDs are common, but that they do in fact exist. Defendants do not dispute this point (nor could they). Dr. Van Meter agrees that there are DSDs that "may make it difficult to determine if either prenatally or newborn, a child is male or female." (Van Meter Dep. Dkt. 96-1 at 44:18-22). Dr. Van Meter agrees, as he must, that there are some

people who are born with DSDs, where the person may have atypical chromosomal structure and may not be able to produce either ova or sperm. (*Id.* at 44:11-17, 57:20 – 58:10, 60:7 – 61-14, 65:2-22, 66:7-10). In some situations the child and parents, in consultation with a multidisciplinary group of experts, will have to decide whether the child will identify as a boy or girl. (*Id.* at 62:11 – 64:22). For example, a percentage of patients with a particular DSD (46, XY LH receptor) will develop female gender identity and a percentage will develop male gender identity. (*Id.*). Therefore, rather than viewing that one's sex "is an immutable feature of human being established at conception" as Dr. Van Meter notes (Dkt. 67 at 4, ¶ 13), for some it simply is not, and he therefore agrees that the application of EO 25-36 might need to be "considered on a case by case basis." (*Id.* at 99:11-12).

Whether they occur in one percent or a fraction of one percent of people, DSDs exist. All the parties' experts agree on this point. And their existence forms a valid basis for Dr. Fortenberry's opinion that EO 25-31 does not account for the complexity of sex because of its "reliance on an immutable categorization as male or female." (Dkt. 28-1 at 8, ¶ 19). Simply put, there are some persons who at the moment of conception, birth, or at any time, produce neither "the large reproductive cell" or "the small reproductive cell" and that confirms Dr. Fortenberry's opinion.

The State also argues that Dr. Fortenberry's opinions on "the causes and characteristics of gender identity" are unreliable and should be excluded. As noted

11

above, Dr. Fortenberry has "considerable personal experience" treating people with gender dysphoria and diverse gender identities. *Moshiri*, 858 F.3d at 1084. Dr. Fortenberry's treatment of thousands of youth with gender identity issues and his provision (and supervision of the provision) of puberty blockers and hormones to young people in his care alone entitles him to opine on these issues. But it is worth also looking into the specific issues the State takes with some of the data Dr. Fortenberry relies on to form his opinions on gender identity.

The State disputes Dr. Fortenberry's opinion that a "substantial proportion of youth" are gender diverse, citing an estimate that "up to 0.6% of adolescent and adult persons in the United States" identify as transgender. (Dkt. 73 at 14). The State's issue is not with Dr. Fortenberry's data, but rather that there is no "rational connection" between the 0.6% figure and his statement that the proportion of gender diverse youth is "substantial." (*Id.*) (citing *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 786-87 (7th Cir. 2017)). The State does not disagree with the percentage, just with its characterization as "substantial." To the extent relevant and necessary, this Court can draw its own conclusions as to the significance of the percentage and can certainly ignore Dr. Fortenberry's characterization. But at the risk of being pulled into defendants' semantic quarrel, the first definition for "substantial" from Merriam-Webster is "not imaginary or illusory." Substantial, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/substantial (last visited September 3, 2025). One of every 200 people, or about

100 people at any given Pacers game, identifying as gender diverse is certainly not an illusory figure. Semantics aside, there is no contention that the particular data he used are unreliable.

The State then puts words in Dr. Fortenberry's mouth, arguing he believes gender identity was "genetically determined." But what Dr. Fortenberry wrote in his report (and what the State quotes) is that "an emerging body of scientific evidence supports a significant biological component." A "biological component," significant or otherwise, is not the same as being "genetically determined," as Dr. Van Meter said himself. (Dkt. 67 at 15, ¶ 47). Moreover, the State takes issue with Dr. Fortenberry's use of a single source to form that opinion, a literature review by Polderman, *et al*. (Dkt. 72-1 at 83), and contends that this single source does not "identify conclusive associations from genomic studies." (Dkt. 73 at 13-14). But even Dr. Van Meter agreed Polderman's review found "significant and consistent evidence for the role of innate genetic factors in the development of both cisgender and transgender identities." (Van Meter Dep., Dkt. 96-1 at 67:20-68:2; Dkt. 72-1 at 93).

A review study, identifying, summarizing, and synthesizing conclusions from previously published studies, is precisely the kind of source one might use to conclude that "an emerging body of scientific evidence" supports some genetic component to gender identity. The State itself relied on a similar review study in their attempt to contest Dr. Fortenberry's opinion on the benefits of social transition. (*See* Dkt. 73 at 13 [referring

13

to a review by Ruth *Hall, et al.*, Dkt. 72-1 at 1913]). Moreover, some of the studies cited by Dr. Van Meter also identify this biological component. Thus, the study of twins by Gorgios Karamansis, cited by Dr. Van Meter (Dkt. 67 at 14, ¶ 44 n.27) concludes that there may be a biological basis for the development of gender dysphoria. (*Id.* at 68:19 – 70:7). Similarly, a study by Heylens that Dr. Van Meter cites (*id.* at 14, ¶ 44 n.28), concludes that "[t]win literature on GID (gender identity disorder, the former name for gender dysphoria) supports the contribution of genetic factors to the development of gender identity with a higher tendency in males than in females" (Van Meter Dep., Dkt. 96-1 at 70:12 – 71:15). Dr. Fortenberry's opinions regarding sex and gender identity are based on sufficient data and must be admitted.

## CONCLUSION

Although Dr. Fortenberry provided background information on transgender status, gender dysphoria, and treatment in his report, the primary significance of his opinions go to how social transition is beneficial in ameliorating the effects of gender dysphoria, a condition that all admit causes clinically significant anxiety or other serious problems.[6] He has treated thousands of persons with gender dysphoria. He has also

---

[6] *See* Dkt. 28-1 at 12-13, ¶¶ 30-31 (Dr. Fortenberry noting that gender dysphoria is a diagnosis of a condition codified by the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, 5th edition, DSM-V-TR ["DSM-V"] as causing clinically significant and persistent stress or impairment of important areas of functioning); Dkt. 96-4 at 29:12 – 32:6 (Dr. Levine admitting that he uses the criteria for gender dysphoria in the DSM-5, although he makes an independent judgment); Dkt. 96-1 at 20:24 – 22:1 (Dr. Van Meter admitting that he is aware of the DSM-V diagnosis of gender dysphoria and that he accepts the diagnosis).

14

assisted his patients in obtaining gender marker changes on identification documents and has had the opportunity to see how that leads to "marked improvement in overall well being." (Dkt. 28-1 at 5, 22 ¶¶ 13, 59).[7] He spent his career observing patients with gender identities that differ from the sex identified at birth and through his research understands, as does the State's expert Dr. Van Meter, that sometimes persons are not conceived or born with either the large reproductive cell (ovum) or the small reproductive cell (sperm). Dr. Fortenberry's considerable clinical experience and knowledge of contemporary research qualifies him as an expert, qualified to render the opinions that he issued. This Court should deny the State's Motion to Exclude Opinions of [Dr.] Fortenberry (Dkt. 72) in its entirety.

Joshua T. Bleisch
Gavin M. Rose
Stevie J. Pactor
Kenneth J. Falk
ACLU of Indiana
1031 E. Washington St.
Indianapolis, IN 46202
317/635-4059
fax: 317/635-4105
jbleisch@aclu-in.org
kfalk@aclu-in.org
grose@aclu-in.org
spactor@aclu-in.org

---

[7] In his deposition Dr. Fortenberry testified that once or twice a week in his career he had signed documents attesting to patients' gender identity for the purpose of obtaining gender marker changes in documents without knowing whether they were for changes in a driver's license or birth certificate. (Dkt. 96-5 at 193:10 – 194:2).

Attorneys for Plaintiffs and the Putative Class