UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| L. A.,<br>JANE DOE, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 1:25-cv-00596-MPB-TAB |
| | ) | |
| MIKE BRAUN,<br>LARRY K. ERVIN, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION</u>

Plaintiffs L.A. and Jane Doe,[1] on behalf of themselves and a putative class, sued

Defendants Mike Braun and Larry K. Ervin in their official capacities under 42 U.S.C. § 1983

for alleged violations of their constitutional rights under the Equal Protection Clause and Due

Process Clause of the Fourteenth Amendment. Before the Court is Plaintiffs' Motion for

Preliminary Injunction, (Docket No. 38),[2] in which Plaintiffs ask the Court to enjoin Governor

Braun's Executive Order 25-36 and Defendants' reliance on it so that Plaintiffs may obtain birth

certificates reflecting their gender identity. For the reasons below, Plaintiffs' Motion for

Preliminary Injunction, (Docket No. 38), is **DENIED**.

## I.    Background

Plaintiffs L.A. and Jane Doe were born in Indiana and have Indiana birth certificates.

(Docket Nos. 18-1 at ECF p. 1; 43-1 at ECF p. 2). Since 1907, the Indiana Department of Health

("IDOH") Division of Vital Records has maintained and issued certified copies of birth

---

[1] Jane Doe's request to proceed pseudonymously was denied, (Docket No. 78), and Plaintiff appealed, (Docket No. 83). The Court addresses that issue in a separate entry. For the sake of consistency, the Court refers to L.A. and Jane Doe collectively as Plaintiffs.

[2] Plaintiffs first moved for preliminary injunction, (Docket No. 9), on April 2, 2025, which is **DENIED as moot**.

certificates. (Docket No. 70 at ECF pp. 1–2). All birth certificates record the sex of an individual, listed as male or female. (*Id.* at ECF p. 3). When a baby is born at a hospital, the delivering doctor identifies the baby's sex by inspecting the baby's genitals. (Docket No. 68 at ECF p. 3). That observation is documented in hospital records and confirmed by the baby's parents before the birth certificate is submitted. (Docket No. 70 at ECF p. 2). Plaintiffs were both born with male genitalia and have birth certificates listing their sex as "male," though they both now identify as female. (Docket Nos. 18-1 at ECF p. 1; 43-1 at ECF p. 1).

Gender identity "refers to characteristics of a person's internal sense of self." (Docket No. 28-1 at ECF p. 10).[3] The majority of the population has a sense of self congruent with their biological sex. (*See id.* at ECF pp. 10, 13). Some children demonstrate patterns of play and assert a verbal identity that is incongruent with their biological sex. (*Id.* at ECF p. 11). That incongruence can continue through puberty and into adulthood. (*Id.*). A person is "transgender" when their biological sex differs from their gender identity. (*Id.*). Studies indicate that up to 0.6% of adolescent and adults in the United States are transgender and that there are approximately 30,000 transgender individuals in Indiana aged 13 and above. (*Id.* at ECF p. 13).

Indiana law allows for certain changes to be made to birth certificates, and the Division of Vital Records sets forth "regulations and policies governing when and how these corrections may be made." (Docket No. 70 at ECF p. 4). For example, changes can be made in the case of an

---

[3] Defendants filed a Motion to Exclude, (Docket No. 72), portions of the opinions of Plaintiffs' expert James D. Fortenberry, (Docket No. 28-1). Defendants argue that Fortenberry's expert report and deposition testimony should be excluded as unsupported and unreliable under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 592 (1993). Defendants challenge his opinions "regarding the causes and characteristics of gender identity," which focus on Fortenberry's claim that there is a biological component to gender identity. (Docket No. 73 at ECF pp. 13–15). While the Court does cite a portion of Fortenberry's report that Defendants purport to challenge, the Court's reliance is limited to defining concepts like gender identity. Moreover, courts resolve preliminary injunction requests "on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). Given the Court's minimal reliance on the report and the expedited nature of this case, Defendants' Motion to Exclude, (Docket No. 72), is **DENIED**.

administrative error, if the person is adopted or changes their name, or by a court order. (*Id.*).
Before 2014, IDOH did not change the sex listed on birth certificates unless it contained a
typographical error. (*Id.* at ECF p. 11). In 2014, the Court of Appeals of Indiana held that Indiana
law "provides general authority for the amendment of birth certificates, without any express
limitation . . . regarding gender amendments," *In re Pet. for Change of Birth Certificate*, 22
N.E.3d 707, 708–09 (Ind. Ct. App. 2014), and IDOH began to issue birth certificates denoting a
person's gender identity when presented with a court order, (Docket No. 70. at ECF pp. 11–12).
Since 2014, IDOH has changed the gender listed on 1,558 birth certificates. (*Id.* at ECF p. 11).
Plaintiffs both obtained a state court order directing IDOH to change their birth certificates to
match their female gender identity. (Docket Nos. 18-1 at ECF p. 4; 43-1 at ECF p. 2).

On March 4, 2025, Indiana Governor Mike Braun issued Executive Order 25-36 (the
"Order"). (Docket No. 34-1). It declared that "Indiana's Executive Branch will respect and
enforce the biological binary of man and woman as a fundamental and deeply rooted principle of
American legal history and tradition that is embedded in Indiana's statutes and Constitution." (*Id.*
at ECF p. 1). In keeping with that policy, the Order directed the executive branch to interpret
"sex" to mean "an individual human being's immutable biological classification as either male or
female." (*Id.*). It also defines "gender" as "synonymous with sex." (*Id.*). The Order rejected
"modern gender ideology" as something "inconsistent with this fundamental and deeply rooted
legal distinction between men and women." (*Id.* at ECF p. 2). It proscribed state executive
branch agencies from "promot[ing] or otherwise inculcat[ing] modern gender ideology." (*Id.*). To
that end, Defendant Larry Ervin, the State Registrar and Division Director of Vital Records at
IDOH, acknowledged that IDOH "will not process gender change requests" due to the Order.
(Docket No. 34-2).

Plaintiffs received state court rulings directing IDOH to change their birth certificates after Governor Braun issued the Order. (Docket Nos. 18-1 at ECF p. 4; 43-1 at ECF p. 2). As a result, Plaintiffs cannot obtain a birth certificate with a sex marker matching their gender identity. Plaintiff L.A. filed this action in late March 2025 and moved for a preliminary injunction shortly thereafter. (Docket Nos. 1; 9). Jane Doe joined the lawsuit, and Plaintiffs filed an Amended Motion for Preliminary Injunction on May 26. (Docket No. 38). This matter became fully briefed on September 5. (Docket No. 98).[4]

## II.    Legal Standard

"A preliminary injunction is an extraordinary equitable remedy that is available only when the movant shows clear need." *Turnell v. CentiMark Corp.*, 796 F.3d 656, 661 (7th Cir. 2015). Plaintiffs "must demonstrate (1) some likelihood of succeeding on the merits, and (2) that [they have] 'no adequate remedy at law' and will suffer 'irreparable harm' if preliminary relief is denied." *Cassell v. Snyders*, 990 F.3d 539, 544–45 (7th Cir. 2021). If Plaintiffs succeed in making this showing, "the court must weigh the harm the denial of the preliminary injunction would cause the plaintiff against the harm to the defendant if the court were to grant it." *Mays v. Dart*, 974 F.3d 810, 818 (7th Cir. 2020). As part of the Court's "sliding scale" analysis, *Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 895 (7th Cir. 2001), "the more likely the plaintiff is to win on the merits, the less the balance of harms needs to weigh in his favor, and vice versa," *Mays*, 974 F.3d at 818.

---

[4] Defendants moved for leave to file a surreply brief. (Docket No. 102). Local Rule 56-1 allows for a surreply "only if the movant cites new evidence in the reply or objects to the admissibility of the evidence cited in the response." S.D. Ind. L.R. 56-1(d). Defendants argue that the surreply is necessary to address the "critiques" Plaintiffs make of their experts, as well as the "new arguments" on sovereign immunity. (Docket No. 102 at ECF p. 2). But Plaintiffs do not object to the admissibility of Defendants' experts, (*see* Docket No. 98 at ECF p. 2 n.1), and Plaintiffs' arguments about sovereign immunity are directly in response to Defendants' challenges. Because there is no need for a surreply, Defendants' Motion, (Docket No. 102), is **DENIED**.

## III.    Discussion

To begin, Defendants raise threshold challenges to Plaintiffs' constitutional claims based on sovereign immunity and standing. As to Governor Braun, an individual sued in his official capacity, Defendants argue that the *Ex parte Young* exception to sovereign immunity under the Eleventh Amendment does not apply. They also argue that based on *Pennhurst*, this Court cannot order state officials, including Defendant Larry K. Ervin, to process state trial court orders. Additionally, Defendants assert that Plaintiffs do not have Article III standing in this case because there is no injury traceable to Defendants that could be redressed by this Court. Each challenge is addressed in turn.

### A. Sovereign Immunity

"Sovereign immunity is the privilege of the sovereign not to be sued without its consent" and is safeguarded by the Eleventh Amendment. *Driftless Area Land Conservancy v. Valcq*, 16 F.4th 508, 520 (7th Cir. 2021) (quoting *Va. Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 253 (2011)). The Eleventh Amendment states: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State . . . ." U.S. Const. amend. XI. In construing this amendment, the Supreme Court has historically "held that an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another State." *Edelmen v. Jordan*, 415 U.S. 651, 663 (1974). "[I]f properly raised, the [A]mendment bars actions in federal court against a state, state agencies, or state officials acting in their official capacities." *Council 31 of the Am. Fed'n of State, Cnty. & Mun. Emps. v. Quinn*, 680 F.3d 875, 881 (7th Cir. 2012) (citation omitted).

But sovereign immunity is not limitless. The *Ex parte Young* doctrine fashions a "narrow exception" to sovereign immunity. *Whole Woman's Health v. Jackson*, 595 U.S. 30, 39 (2021). This narrow exception allows an individual to pierce the shield of sovereign immunity "by asserting that a suit challenging the constitutionality of a state official's action in enforcing state law is not one against the State." *Green v. Mansour*, 474 U.S. 64, 68 (1985). *Ex parte Young* is "necessary to permit the federal courts to vindicate federal rights." *Stewart*, 563 U.S. at 254–55 (citation modified).

### 1. Governor Braun

The *Ex parte Young* doctrine affords only prospective relief to stop future harms. *See id.* at 255; *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002) (requiring the complaint to allege that the defendant is engaging in an "ongoing violation of federal law and seeks relief properly characterized as prospective") (citation modified). Defendants argue that Plaintiffs' claims against Governor Braun do not fit under *Ex parte Young* because they are challenging his "*past* actions" in issuing the Order, which neither requires nor prohibits any action by Plaintiffs but instead lays down interpretive executive guidance as to Indiana law. *United States v. Abbott*, 85 F.4th 328, 336 (5th Cir. 2023) (emphasis in original). According to Defendants, Plaintiffs' requested relief targets a past action and lies beyond *Ex parte Young*'s reach. *Verizon Md., Inc.*, 536 U.S. at 645–46.

Defendants' reliance on the Fifth Circuit's approach to *Ex parte Young* is unavailing. The Supreme Court has held that a request for injunctive relief which seeks to restrain "state officials . . . from enforcing an order in contravention of controlling federal law" clearly satisfies the requirements for *Ex parte Young*. *Id.* at 645. Here, Plaintiffs ask the Court to "issue a preliminary injunction enjoining Executive Order 25-36 and [D]efendants' reliance on it[.]" (Docket No. 38

6

at ECF p. 2). And Plaintiffs allege that the continued operation of the Order "violates the United States Constitution" by prohibiting gender marker changes. (*Id.* at ECF p. 1). This ongoing harm is different from *Pearson v. Pritzker*, where a district court held that sovereign immunity barred plaintiff's claim against the Governor of Illinois in part because the challenged Orders expired before the request for injunctive relief. No. 20-cv-2888, 2021 WL 1121086, at *7 (N.D. Ill. Mar. 24, 2021). Because Plaintiffs allege an "ongoing violation of federal law and seek[] relief properly characterized as prospective," *Verizon Md., Inc.*, 535 U.S. at 645 (citation omitted), the claims against Governor Braun fit under *Ex parte Young*.

### 2. Larry K. Ervin

Defendants also argue that this Court lacks authority to order state officials to comply with state law—an important limitation to *Ex parte Young*. In *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 121 (1984), the Supreme Court held that the Eleventh Amendment bars federal courts from enjoining state officers from violating state law. In reaching its decision, the Court stressed that "[a] federal court's grant of relief against state officials on the basis of state law, whether prospective or retroactive, does not vindicate the supreme authority of federal law" and therefore does not provide an end-run around the State's sovereign immunity. *Id.* at 106. To determine whether *Ex parte Young* bypasses an immunity bar, such as *Pennhurst*, courts conduct a "straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Verizon Md., Inc.*, 535 U.S. at 645.

A straightforward inquiry shows that *Pennhurst* is not an issue here.[5] In their Amended Complaint, Plaintiffs allege an "ongoing violation of federal law"—that Defendant Ervin's failure

---

[5] Defendants' basis for their *Pennhurst* argument is that Plaintiffs' constitutional claims presuppose "that the orders obtained by Plaintiffs and proposed class members in state court are valid and enforceable under Indiana law,"

to comply with state court orders violates the Equal Protection Clause and Due Process Clause—and they request "relief properly characterized as prospective" in the form of an injunction that enjoins the Order and Defendant Ervin's reliance on it. *Id.* (citation omitted); (*see* Docket No. 34 at ECF p. 22). Both allegations satisfy *Ex parte Young* and thus enable Plaintiffs to evade the *Pennhurst* sovereign immunity limitation.

## B. Standing

Defendants' standing arguments fare no better. Standing is a "bedrock" constitutional principle premised on "the idea of separation of powers." *United States v. Texas*, 599 U.S. 670, 675 (2023) (citation omitted). To establish Article III standing, a plaintiff bears the burden of establishing (1) "that she has suffered or likely will suffer an injury in fact," (2) "that the injury likely was caused or will be caused by the defendant," and (3) "that the injury likely would be redressed by the requested judicial relief." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). These constitute "an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan*, 504 U.S. at 560.

An injury-in-fact must be "concrete, particularized, and actual or imminent." *Ewing v. MED-1 Sols., LLC*, 24 F.4th 1146, 1151 (7th Cir. 2022). A concrete injury is "real," not "abstract." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016). Here, Plaintiffs have established a concrete injury. In March 2025, Plaintiffs obtained orders from state trial courts requiring IDOH to change the gender markers on their birth certificates. (Docket Nos. 18-1 at ECF p. 4; 43-1 at

---

(Docket No. 65 at ECF p. 17), and the State is moving to intervene to set aside similar orders. Defendants raise this argument again in the standing and abstention sections. While uncertainty about the operation and effect of Indiana law may present standing issues, or counsel in favor of abstention, it does not present an obstacle to Plaintiff's claims on sovereign immunity grounds.

ECF p. 2). Neither one was changed. (Docket Nos. 18-1 at ECF p. 4; 43-1 at ECF p. 3). This constitutes an actual and concrete injury sufficient for Article III standing.

Causation and redressability are often addressed together. *Lujan*, 504 U.S. at 562. "If a defendant's action causes an injury, enjoining the action . . . will typically redress that injury," and therefore the most contested questions "in standing disputes are injury in fact and causation." *All. for Hippocratic Med.*, 602 U.S. at 381. As to causation, Plaintiffs must establish their injuries "likely" were caused or "likely will be caused by the defendant's conduct." *Id.* at 382.

In cases where plaintiffs challenge "the government's allegedly unlawful regulation (or lack of regulation) of *someone else*," as Plaintiffs do here, "standing is not precluded, but it is ordinarily substantially more difficult to establish." *Lujan*, 504 U.S. at 562 (emphases in original) (citation modified). Parties cannot satisfy the causation inquiry by "rely[ing] on *speculation* about the unfettered choices made by independent actors not before the court." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013) (emphasis added) (citation modified). To carefully "thread the causation needle," *All. for Hippocratic Med.*, 602 U.S. at 383, Plaintiffs must show that the "third parties will likely react in predictable ways" that will likely injure them, *California v. Texas*, 593 U.S. 659, 675 (2021) (citation omitted).

Defendants attempt to inject speculation into the causation inquiry by arguing that the constitutional claims rest on the assumption that the state trial court orders obtained by Plaintiffs are valid and enforceable under Indiana law. This is because the State is moving to intervene in state court and asking the court to set aside similarly obtained orders, arguing that the court lacks personal jurisdiction and that the orders are based on a flawed interpretation of state law. (*See* Docket Nos. 65-1 at ECF pp. 148–150, 153–170). Under Defendants' logic, if the State prevails and Indiana law does not authorize state courts to order IDOH to amend the sex listed on birth

certificates, then Plaintiffs' injuries would be caused by the lack of *authorization* in Indiana law—not Defendant Ervin's reliance on the Order.

This argument presents an interesting hypothetical, but it is not up for resolution today. The narrow legal question before this Court is whether Plaintiffs—who have obtained state court orders requiring IDOH to amend their birth certificates—have established that their injuries "likely" were "caused" by Defendants' issuance and subsequent reliance on the Order. *All. for Hippocratic Med.*, 602 U.S. at 382. Because Defendant Ervin's refusal to process gender change requests is a "predictable" response to Governor Braun's Order, this Court is satisfied that Plaintiffs have carried their burden in establishing causation and redressability. *California*, 593 U.S. at 675. Thus, Plaintiffs have standing to pursue their claims.

## C. Abstention

With jurisdiction established, Defendants ask this Court not to exercise it. Specifically, Defendants argue that the *Pullman* abstention doctrine applies.[6] *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496, 501–02 (1941), established that, when a constitutional question is premised on an unsettled question of state law, the federal court should postpone adjudication of the case while a separate action is adjudicated in state court. Abstention is particularly appropriate "in cases presenting a federal constitutional issue which might be mooted or presented in a different posture by a state court determination of pertinent state law." *City Investing Co. v. Simcox*, 633 F.2d 56, 60 (7th Cir. 1980) (citation modified). Abstention is the exception, not the rule, and it "is warranted only when (1) there is a substantial uncertainty as to

---

[6] Defendants also advocate for *Younger* abstention. But as Plaintiffs point out, *Younger* abstention is appropriate only in "three classes of cases: where federal jurisdiction would intrude into ongoing state criminal proceedings, or into certain civil enforcement proceedings (judicial or administrative) akin to criminal prosecutions, or into civil proceedings 'that implicate a State's interest in enforcing the orders and judgments of its courts.'" *Mulholland v. Marion Cnty. Elec. Bd.*, 746 F.3d 811, 815 (7th Cir. 2014) (quoting *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 72–73 (2013)). None of those circumstances are present here.

the meaning of the state law and (2) there exists a reasonable probability that the state court's clarification of state law might obviate the need for a federal constitutional ruling." *Int'l Coll. of Surgeons v. City of Chicago*, 153 F.3d 356, 365 (7th Cir. 1998). "The purpose of *Pullman* abstention is to 'avoid the waste of a tentative decision as well as the friction of a premature constitutional adjudication,'" out of respect for principles of comity and federalism. *Wis. Right to Life State Pol. Action Comm. v. Barland*, 664 F.3d 139, 150 (7th Cir. 2011) (quoting *Pullman*, 312 U.S. at 500).

Defendants maintain that both circumstances justifying *Pullman* abstention are present here because the State is litigating the validity of the trial court orders commanding IDOH to amend birth certificates. They argue if the Indiana Supreme Court finds there is no basis under Indiana law for Indiana trial courts to issue orders commanding IDOH to change birth certificates, that might "obviate the need for a federal constitutional ruling" because Plaintiffs would struggle to show the necessary causation for Article III standing. *Int'l Coll. of Surgeons*, 153 F.3d at 365. The problem with Defendants' argument is that there is no guarantee the Indiana Supreme Court would take the case, let alone resolve the complicated issue of state law. Because there is a reasonable risk that state courts will not clarify state law in a way that "obviate[s] the need for a federal constitutional ruling," *id.*, *Pullman* abstention is not warranted.

**D. Likelihood of Success on the Merits**

Assured of its jurisdiction, the Court turns to the likelihood of success on the merits. The fundamental legal issue is whether the Constitution requires Indiana to change birth certificates of transgender individuals to reflect their gender identities. Plaintiffs provide four justifications for an injunction: (1) the Order discriminates based on sex; (2) the Order discriminates based on

transgender status; (3) the Order is motivated by animus; and (4) the Order infringes a

substantive due process right to informational privacy. Defendants challenge each theory.

### 1. Equal Protection

The Fourteenth Amendment prohibits a State from denying any person "the equal

protection of the laws." U.S. Const. amend. XIV, § 1. Laws that classify based on sex trigger

intermediate scrutiny, requiring the State to show the "classification serves important

governmental objectives and that the discriminatory means employed are substantially related to

the achievement of those objectives." *United States v. Virginia*, 518 U.S. 515, 533 (1996). But "if

a law neither burdens a fundamental right nor targets a suspect class," courts "will uphold the . . .

classification so long as it bears a rational relation to some legitimate end." *Romer v. Evans*, 517

U.S. 620, 631 (1996). At its core, the Equal Protection Clause requires States to "treat like cases

alike." *Vacco v. Quill*, 521 U.S. 793, 799 (1997).

The Court construes Plaintiffs' equal protection claim as challenging both the Order and

IDOH's policy ("Policy") in following it. (Docket No. 43 at ECF pp. 4–6). Plaintiffs argue for

review under heightened scrutiny because the Order and Policy "classif[y] based on sex," (*id.* at

ECF p. 20), and "transgender status," (*id.* at ECF p. 24). Defendants argue that rational basis

applies.

#### (a) Differential treatment based on sex

First, there is no discrimination on the basis of sex because the Order applies to *everyone*

equally across the board. Neither males nor females may acquire amended birth certificates

listing a new category—their gender identity—instead of their sex. (*See* Docket No. 70 at ECF p.

13) (explaining that IDOH "[c]urrently . . . is not processing *any* sex designation change

requests.") (emphasis added). Plaintiffs argue that the Order "classifies based on sex" because it

defines "sex" and provides for the issuance of a "'male' or 'female' birth certificate." (Docket No. 43 at ECF p. 20). But "mere reference to sex" is not enough on its own "to trigger heightened scrutiny" under the Fourteenth Amendment. *United States v. Skrmetti*, 145 S. Ct. 1816, 1829 (2025); *see also K.C. v. Individual Members of the Med. Licensing Bd. of Ind.*, 121 F.4th 604, 617 (7th Cir. 2024) (explaining that a state does not "draw[] a sex-based classification each time it must reference sex to enforce the law."). At bottom, neither the Policy nor the Order requires "one rule for" males and "another for" females. *Sessions v. Morales-Santana*, 582 U.S. 47, 58 (2017). Nor does the Order or Policy afford preferential treatment for one sex over another. *Reed v. Reed*, 404 U.S. 71, 73, 76 (1971). Both treat the sexes equally.

*Skrmetti* provides an exegesis of this point. In that case, the Supreme Court held that Tennessee's SB1 prohibiting certain medical treatments for transgender minors was not subject to heightened scrutiny under the Equal Protection Clause and satisfied rational basis review. 145 S. Ct. at 1828–37. There, plaintiffs argued that SB1 warranted heightened scrutiny because it relied on sex-based classifications, but the Court rejected that argument and concluded that "SB1 prohibits healthcare providers from administering puberty blockers and hormones to *minors* for certain *medical uses*, regardless of a minor's sex." *Id.* at 1829 (emphases in original). The Supreme Court went on to observe that because the law's prohibitions apply "*regardless . . .* of sex," the law did not classify on the basis of sex. *Id.* (emphasis added).

While *Skrmetti* did not involve birth certificates, the Supreme Court recently vacated and remanded for further consideration the Tenth Circuit's decision that plaintiffs stated an equal protection claim in challenging an Oklahoma policy not to amend birth certificates to list gender identity. *See Stitt v. Fowler*, No. 24-801, 2025 WL 1787695 (June 30, 2025). Thus, *Skrmetti's* reasoning should apply to the case before this Court. And the Seventh Circuit, too, has held that a

law that "appl[ies] evenhandedly to all" does not classify based on sex. *K.C.*, 121 F.4th at 615 (citation omitted). The Order and Policy do not bestow "a benefit within reach of one sex and out of reach of the other" or place a burden on one sex over the other. *Id.* at 616 (collecting cases involving laws that entail "differential treatment"). In Indiana, nobody—male or female—can get an amended birth certificate reflecting a person's gender identity.

In support of their argument to the contrary, Plaintiffs rely on *Whitaker ex rel. Whitaker v. Kenosha Unified School District No. 1 Board of Education*, 858 F.3d 1034, 1051 (7th Cir. 2017). But *Whitaker* is hanging on by a thread post-*Skrmetti*. Indeed, the Seventh Circuit recently "grant[ed] panel rehearing to consider whether the court should overrule" *Whitaker* "in light of *Skrmetti*." *D.P. by A.B. v. Mukwonago Area Sch. Dist.*, No. 23-2568, 2025 WL 1794428, at *1 (7th Cir. June 30, 2025). Still, *Whitaker* is distinguishable from the case at hand: the classifications in *Whitaker* centered on a failure to "conform to . . . sex-based stereotypes." 858 F.3d at 1048; *see also K.C.*, 121 F.4th at 618 n.2 (explaining that "sex-based stereotyping is not at issue" where the classification does not turn on "how the [person] acted or dressed" or "external manifestation[s] of gender"). Nothing in the Policy or Order ratifies sex-based stereotypes. Indiana law simply requires IDOH to record the historical, immutable fact of a person's sex at birth. For these reasons, *Whitaker* is distinguishable.

Plaintiffs also rely on *Bostock v. Clayton County*, 590 U.S. 644 (2020), to support their argument that the Order classifies based on sex, but that case provides no rescue to their position. In *Bostock*, the Supreme Court interpreted the meaning of the word "sex" in Title VII of the Civil Rights Act to hold that an employer who fires an employee for being gay or transgender violates Title VII's bar on discharging an individual because of their sex. *See id.* at 683. But the Supreme Court has not extended *Bostock*'s reasoning beyond the confines of Title VII, and neither will this

Court. *See Skrmetti*, 145 S. Ct. at 1834–35 (cautioning that the Supreme Court has "not yet considered whether *Bostock*'s reasoning reaches beyond the Title VII context" before finding that "sex is simply not a but-for cause of SB1's operation"); *see also K.C.*, 121 F.4th at 619–20 (reasoning that "*Bostock* is of no use when interpreting the Equal Protection Clause" because the clause does not use the word "sex" and was "ratified nearly a century before" Title VII). Considering *Skrmetti*'s hesitancy to extend *Bostock*, this Court is not persuaded by Plaintiffs' reliance on an out-of-circuit district court decision applying *Bostock*'s reasoning to its equal protection analysis on a similar issue. *See Orr v. Trump*, 778 F. Supp. 3d 394, 410 (D. Mass. 2025).

Governments "naturally choose[] what to say and what not to say. That must be true for government to work." *Shurtleff v. City of Boston*, 596 U.S. 243, 251 (2022). Since 1907, Indiana has deliberately chosen to record sex—not gender identity—on birth certificates. Governor Braun's Order commanded state officials to adhere to that practice, and as a result Plaintiffs cannot obtain a birth certificate listing their gender identity. But the Order does not discriminate based on sex—it applies equally to the sexes. Entering a preliminary injunction in favor of Plaintiffs on this ground would require this Court, impermissibly, to transform a policy objection into a constitutional violation.

### (b) *Transgender status as a quasi-suspect class*

Plaintiffs also argue that the Order and Policy should be subject to heightened scrutiny because transgender individuals are a suspect or quasi-suspect class. Recent caselaw indicates otherwise. *See Skrmetti*, 145 S. Ct. at 1832 (explaining the Supreme Court "has not previously held that transgender individuals are a suspect or quasi-suspect class"). To assess whether transgender individuals qualify as a suspect class, the Court asks whether this group (1) is a

15

"discrete group" defined by "obvious, immutable, or distinguishing characteristics"; (2) has historically "been subjected to discrimination" by the state; and (3) is a "minority or politically powerless." *Lyng v. Castillo*, 477 U.S. 635, 638 (1986). In *K.C.*, the Seventh Circuit commented that transgender individuals are neither defined by immutable characteristics nor politically powerless. 121 F.4th at 620 n.3. These observations warrant further discussion.

Immutability is "one of the factors most consistently present in Equal Protection cases." *Id.* (collecting cases). But a person's transgender identification—unlike race or national origin— is not a similarly "immutable characteristic determined solely by the accident of birth." *Id.* (quoting *Segovia v. United States*, 880 F.3d 384, 390 (7th Cir. 2018)). Individuals who identify as transgender may detransition or desist, as both parties highlight. (*See* Docket Nos. 67 at ECF p. 13; 73-1 at ECF pp. 68–69.). As the Seventh Circuit pointed out, "[a] transgender adolescent who realizes in adulthood that his gender identity matches his sex would lose constitutional protection entirely." *K.C.*, 121 F.4th at 620 n.3. This Court agrees that transgender identity operates in a way that "is fundamentally different than an immutable characteristic determined at birth." *Id.*

Nor have transgender individuals "been relegated 'to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process.'" *Id.* (quoting *S.A. Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 28 (1973)). "They have never been denied the right to 'hold office, serve on juries, or bring suit in their own names,' nor have they been denied the right to vote because they are transgender." *Id.* (quoting *Frontiero v. Richardson*, 411 U.S. 677, 685 (1973)). The response of legislatures and other political action groups "negates any claim that [transgender people] . . . have no ability to attract the attention of the lawmakers." *City of Cleburne*, 473 U.S. at 445.

16

Plaintiffs cite a host of out-of-circuit caselaw in support of the argument that transgender individuals are a suspect or quasi-suspect class. (*See* Docket No. 43 at ECF p. 23–24) (collecting cases). But this Court finds the logic of *K.C.*, its circuit court, more persuasive, and will follow the lead of the Seventh Circuit and the Supreme Court.

At bottom, the Policy does not discriminate based on sex; males cannot change their birth certificate marker to female, and females cannot change theirs to male. And recent caselaw indicates that transgender individuals are not a protected class. This path leads to one conclusion: heightened scrutiny does not apply.

### (c) Rational basis review is satisfied

Because heightened scrutiny does not apply, the Court must apply rational basis review. "When applying rational basis review to an equal protection claim, [courts] are highly deferential to the government." *Hope v. Comm'r of Ind. Dep't of Corr.*, 66 F.4th 647, 650 (7th Cir. 2023). Courts will thus uphold a policy "so long as there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Skrmetti*, 145 S.Ct. at 1835. (citation modified). If "plausible reasons" exist, the Court's "inquiry is at an end." *Id.* (citation modified). At that point, the Court will not question the "wisdom, fairness, or logic" of Indiana's path. *Id.* at 1837 (citation omitted).

The Order and Policy successfully advance "the State's interest in maintaining a consistent, objective definition of sex in interpreting and applying Indiana law." (Docket No. 65 at ECF p. 25). Defendants assert that having that consistent definition of sex "protects the integrity and accuracy of [Indiana's] vital records." (*Id.* at ECF p. 26) (citation modified). Other courts have held these asserted interests survive rational basis review. *See, e.g., Gore v. Lee*, 107 F.4th 548, 561 (6th Cir. 2024) (concluding that "[m]aintaining a consistent definition, based on

physical identification at birth," was "a legitimate State interest"); *Corbitt v. Sec'y of the Ala. L. Enf't Agency*, 115 F.4th 1335, 1349 (11th Cir. 2024) (observing that states have an interest in "developing and maintaining a uniform legal scheme and consistent policies and procedures"); *Tuan Anh Nguyen v. INS*, 533 U.S. 53, 73 (2001) (honoring this "most basic biological difference[]" avoids the risk of "making the guarantee of equal protection superficial"); *Adams ex rel. Kasper v. Sch. Bd. of St. John's Cnty.*, 57 F.4th 791, 803 n.6 (11th Cir. 2022) (recognizing that "biological sex . . . is the driving force behind the Supreme Court's sex-discrimination jurisprudence"). This Court, too, recognizes this interest as legitimate.

Plaintiffs characterize the Order and Policy as something "born of animosity" towards transgender individuals. (Docket No. 43 at ECF p. 27) (quoting *Romer v. Evans*, 517 U.S. 620, 634 (1996)). But since Indiana began recording births in 1907, IDOH has recorded biological sex. (Docket No. 70 at ECF p. 2). Under Indiana law, IDOH must "make a permanent record . . . from a birth certificate" including "sex." Ind. Code § 16-37-2-9(a)(2). This requirement serves several legitimate interests, including "[t]racking the biological sex of infants at birth," which assists "the public health of the state," *Gore*, 107 F.4th at 561, as well "maintaining a consistent, historical, and biologically based definition of sex," which safeguards and promotes "the integrity and accuracy of [the State's] vital records," *id.* In short, the Order and Policy have a rational basis. Plaintiffs are unlikely to succeed on the merits of their Equal Protection claim.

### 2. Substantive Due Process

Plaintiffs also allege that the Policy violates their substantive due process rights. The Due Process Clause protects certain privacy rights, including the "individual interest in avoiding disclosure of personal matters." *Whalen v. Roe*, 429 U.S. 589, 599–600 (1977). From that principle, Plaintiffs identify a right to refrain from "the forced disclosure of one's transgender

18

status." (Docket No. 43 at ECF p 28). Defendants, on the other hand, characterize Plaintiffs as seeking the "right to change the sex designation on a birth certificate to conform to a person's gender identity." (Docket No. 65 at ECF p. 28). The Court sees little difference in these characterizations, but it will adopt Plaintiffs' formulation.[7] That leaves two inquiries: (1) is this a right that has been recognized by existing binding authority, and (2) if this is a new substantive right, is it deeply rooted in this Nation's history and tradition? Both inquiries yield the same answer—no.

Start with the existing caselaw on the right to privacy in "avoiding disclosure of personal matters." *Whalen*, 429 U.S. at 599. In *Denius v. Dunlap*, the Seventh Circuit noted "the scope and contours of this right have not been defined" and that "it is not clear whether the right of confidentiality covers all confidential information or only confidential information relating to certain matters." 209 F.3d 944, 955–56 (7th Cir. 2000). The court cataloged its history on this topic dating back to *Schaill ex rel. Kross v. Tippecanoe County School Corporation*, 864 F.2d 1309, 1322 n.19 (7th Cir. 1989). The *Denius* court then held that there was "a clearly established 'substantial' right in the confidentiality of medical information," 209 F.3d at 956 (citation omitted), as well as protection for "some types of financial information," *id.* at 958.

Following *Denius*, the Seventh Circuit again engaged with *Whalen* in *Wolfe v. Schafer*, 619 F.3d 782, 785 (7th Cir. 2010). There, the court observed that "courts of appeals, including this court, have interpreted *Whalen* to recognize a constitutional right to the privacy of medical, sexual, financial, and perhaps other categories of highly personal information[.]" *Id.* In *Wolfe*, a former electoral candidate sued his opponent, alleging the opponent violated the Fourteenth

---

[7] The Court is conscious of the need to "carefully formulat[e] the interest at stake" and "define[] the right at issue narrowly." *K.C.*, 121 F.4th at 623 (quoting *Washington v. Glucksberg*, 521 U.S. 702, 722–23 (1997)). But regardless of how the Court defines the right, there is no binding legal support for either conception.

Amendment by publicly disclosing the candidate was under investigation for possible violations of Illinois law. *Id.* at 783. The Seventh Circuit affirmed dismissal of the case, *id.* at 786, finding no due process violation. More recently, the court confronted the argument that there is a "clearly established right to privacy in [a person's] sexual preference or gender identity." *Doe v. Gray*, 75 F.4th 710, 716 (7th Cir. 2023). In that case, plaintiff cited *Wolfe*, *Denius*, and *Schaill* in support, but the court found that none of those cases clearly established such a right. *Id.* at 717–18. Despite *Whalen*'s sweeping language, there is no Seventh Circuit or Supreme Court precedent holding that the Due Process Clause protects the right to avoid the disclosure of a person's transgender status.

Plaintiffs rely on out-of-circuit cases that have "*extended* the right to informational privacy to apply to the forced disclosure of one's transgender status." (Docket No. 43 at ECF p. 28) (emphasis added). To be sure, the Second Circuit found that transgender individuals "are among those who possess a constitutional right to maintain medical confidentiality," *Powell v. Schriver*, 175 F.3d 107, 112 (2d Cir. 1999), though that case involved the disclosure of a prisoner's transgender status to other inmates. And in a nearly identical case to the one here, an Ohio district court found the plaintiffs "submitted sufficient evidence to demonstrate that they have a substantive due process right to informational privacy that protects against the forced disclosure of the unchanged sex marker on their birth certificates." *Ray v. McCloud*, 507 F. Supp. 3d 925, 934 (S.D. Ohio 2020). But those out-of-circuit cases are not binding on this Court. Moreover, the persuasive value of *Ray* is in flux following *Gore*, where the Sixth Circuit found "[t]here is no deeply rooted right to a birth certificate matching one's gender identity." 107 F.4th at 565.

Having found no Supreme Court or Seventh Circuit caselaw supporting the right Plaintiffs identify, This Court will not "break new ground," *Glucksberg*, 521 U.S. at 720 (citation omitted), and extend the right to informational privacy without asking "whether the subject matter of the deprivation is fundamental in the first place[,]" *K.C.*, 121 F.4th at 623. Put another way, the Policy is subject to heightened scrutiny only if it interferes with a right "deeply rooted in [our] history and tradition and . . . essential to our Nation's scheme of ordered liberty." *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 237 (2022) (citation modified). Plaintiffs cannot show that the right to avoid the disclosure of a person's transgender status is deeply rooted in our history or tradition. Indiana law first allowed for a mechanism to change the sex listed on birth certificates to conform with a person's gender identity in 2014. *In re Petition for Change of Birth Certificate*, 22 N.E.3d 707 (Ind. Ct. App. 2014). Such a recent development is neither deeply rooted nor essential to ordered liberty. And recent Indiana caselaw "concluded that the statute governing . . . corrections to birth certificates does not provide a mechanism by which a parent can seek to have a child's gender marker changed on a birth certificate[.]" *Wallace v. State*, 236 N.E.3d 1133, 1139 (Ind. Ct. App. 2024). That development further cuts against any argument that the right to avoid the disclosure of a person's transgender status is deeply rooted. The Sixth Circuit came to the same conclusion. *Gore*, 107 F.4th at 565.

Having concluded that the Order and Policy do not infringe on a previously identified substantive right to privacy and that the right Plaintiffs identify is not fundamental, the Court must apply rational basis review. The "analysis is essentially the same" under substantive due process and the Equal Protection Clause. *K.C.*, 121 F.4th at 627. As discussed above, the Order and Policy are supported by a rational basis. Recording biological sex on birth certificates serves several legitimate state interests, including "[t]racking the biological sex of infants at birth,"

which assists "the public health of the state," *Gore*, 107 F.4th at 561, as well "maintaining a consistent, historical, and biologically based definition of sex," which safeguards and promotes "the integrity and accuracy of [the State's] vital records," *id.* (citation omitted).

Thus, Plaintiffs are unlikely to succeed on the merits of either their Equal Protection or Due Process claim, cutting against an injunction.

### E.  Irreparable Harm

Parties seeking a preliminary injunction must "demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (emphasis in original). Plaintiffs cite caselaw holding that "a plaintiff can demonstrate . . . irreparable harm if the claim is based upon a violation of the plaintiff's constitutional rights." *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002). But while violations of certain constitutional rights "are presumed to constitute irreparable injuries," *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 867 (7th Cir. 2006), Plaintiffs have not shown that they are likely to succeed on the merits. In *K.C.*, the Seventh Circuit found the district court's decision to weigh this factor in plaintiff's favor to be clearly erroneous without a sufficient demonstration of success on the merits. 121 F.4th at 632. Thus, the assertion of a Fourteenth Amendment violation, by itself, is not enough to show irreparable harm.

Plaintiffs also point to gender dysphoria and claim that unchanged birth certificates "cause[] continued emotional distress and harm." (Docket No. 43 at ECF p. 33). To be sure, another court has found that having a sex marker incongruent with a person's gender identity may cause that person "to experience worsened gender dysphoria, anxiety, and psychological distress[.]" *Orr*, 778 F. Supp. 3d at 428. Plaintiffs cite similar evidence here. (Docket Nos. 18-1 at ECF pp. 2–6; 43-1 at ECF pp. 1–5). But record evidence also indicates an "absence of robust

evidence of the benefits or harms of social transition" for transgender individuals. (Docket No. 66 at ECF p. 58). And Plaintiffs' expert points to only a handful of cases where transgender patients raised distress caused by their birth certificate. (Docket No. 73-1 at ECF pp. 39–43). Record evidence is a mixed bag on irreparable harm. This factor does not clearly weigh in Plaintiffs' favor.

### F. Balance of Equities and Public Interest

Finally, the Court must weigh "the irreparable harm the moving party will endure if the preliminary injunction is wrongfully denied versus the irreparable harm to the nonmoving party if it is wrongfully granted." *DM Trans, LLC v. Scott*, 38 F.4th 608, 622 (7th Cir. 2022) (citation omitted). This sliding scale analysis means that "the more likely the plaintiff is to win on the merits, the less the balance of harms needs to weigh in his favor, and vice versa." *Mays*, 974 F.3d at 818. The balance of the equities and the public interest "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Having found that Plaintiffs are unlikely to succeed on the merits, the balance of the harms must weigh greatly in their favor. It does not. As such, the balance of the equities favors Defendants.

### IV. Conclusion

For the reasons set forth above, Plaintiffs' Motion for Preliminary Injunction, (Docket No. 38), is **DENIED**. Furthermore, Defendants' Motion to Exclude, (Docket No. 72), is **DENIED**. Plaintiffs' first Motion for Preliminary Injunction, (Docket No. 9), is **DENIED as**

**moot**. Defendants' Motion for Leave to File Surreply, (Docket No. 102), is **DENIED**.

**IT IS SO ORDERED**.

Dated:  September 26, 2025

Matthew P. Brookman, Judge
United States District Court
Southern District of Indiana

Served electronically on all ECF-registered counsel of record.